IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF PUERTO RICO

IN RE:                                    :        CASE NO. 12-00778 (ESL)

COSTA BONITA BEACH RESORT, INC.           :        CHAPTER 11

    Debtor                                :

                                 :

## OPINION AND ORDER

This case came before the court on April 29 and 30, 2014 for a hearing to consider the *Motion to Convert to Chapter 7* (as supplemented orally at such hearing, the *"Motion to Convert"*, Docket No. 374) filed by DF SERVICING, LLC ("DF"), and the *Opposition* thereto filed by the Debtor (the *"Opposition"*, Docket No. 400).

### Jurisdiction

The court has jurisdiction over the instant contested matter pursuant to 28 U.S.C. §§ 157(a) and 1334(b). This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(1) and 157(b)(2). See In re Ashley Oaks Dev. Corp., 458 B.R. 280, 282 (Bankr. D.S.C. 2011) (finding that the disposition of motions to convert or dismiss constitutes a core proceeding under 11 U.S.C. § 157(b)(2)).

### Previous Decisions Regarding the Debtor in the Instant Case

The issue presently before the court, DF's *Motion to Convert* the Chapter 11 petition to a Chapter 7, and others related thereto, are not new. In the prior petition, Case No. 09-00699, the court entered an order finding and concluding that the Debtor was a single asset real estate as defined in 11 U.S.C. § 101(51B). See In re Costa Bonita Beach Resort, Inc., 2009 WL 2900035, 2009 Bankr. LEXIS 2704 (Bankr. D.P.R. July 24, 2009). In the prior petition, the court also considered the predial servitude controversy dating back to the year 2001, and lifted the automatic stay in order that DEV, S.E. may enforce its judgment for the removal of an illegal easement and the restoration of the land to its original condition. See In re Costa Bonita Beach Resort, Inc., 2010 WL 696617 (Bankr. D.P.R. February 23, 2010). In this case the court entered an Opinion and Order on August 27, 2012, denying DF's motion to dismiss under 11 U.S.C. § 1112(b)(4)(A) and for lack of good faith; denying the request for the appointment of an examiner under 11 U.S.C. § 1104(a); and denying the request for dismissal on abstention grounds pursuant to 11 U.S.C. § 305(a). See

In re Costa Bonita, 479 B.R. 14 (Bankr. P.R. 2012). Timing may have been a critical issue to the August 2014 decision. The petition was filed in February 2012 and DF's motion was filed in April 2012.

The travel of the case and factual background is narrated in these prior decisions. The court will expand on the same only as they relate to the contested matter before the court and the evidence presented during the April 2014 hearings. The court notes that the Debtor may be questioning some factual findings made in prior decisions. However, the court will not explicate the same as there is no particular basis or support for any discrepancy.

Procedural Background

The Debtor filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on February 2, 2012 (the "Petition Date"). See Docket No. 1.[1]

1. Prior to the Petition Date, the Debtor entered into various loan agreements with Doral Bank, pursuant to which Doral Bank provided certain credit facilities to Debtor (the "Loans"). See e.g. DF's Proof of Claim No. 16-2 and the Debtor's *Request for Payment of Surcharge under Section 506(c) of the Bankruptcy Code* (the "*Surcharge Motion*", Docket No. 370).The Loans are secured by the following real property (the "Real Estate Collateral" or the "Collateral"):

> RUSTICA: Predio de terreno en el Barrio Frailes de la Isla de Culebra, Puerto Rico, compuesto de diez cuerdas con doscientos cincuenta y dos mil milésimas (10.0252) de otra, equivalentes a treinta y nueve mil cuatrocientos dos punto nueve cuatro cinco (39,402.945) metros cuadrados. Colinda por el Norte, con la finca propiedad de Miguel González Ávila y con la Zona Marítima; por el Sur, con una parcela de la Marina de los Estados Unidos de América en ciento cuarenta punto cuarenta y seis (140.46) metros; por el Este, con la finca propiedad de Miguel González Ávila; y por el Oeste con la Zona Marítima.

See DF's Proof of Claim No. 16-2; and the Surcharge Motion. Docket No. 370 at ¶ 6.

2. The Real Estate Collateral is composed of fifty (50) unsold apartment units, as well as a commercial space, and related real estate known as the Costa Bonita Beach Resort project (the "Project").

3. The Real Estate Collateral is the Debtor's sole (or main) asset and, accordingly, this is a

---

[1] This is Debtor's second bankruptcy filing in less than five (5) years. Debtor's prior bankruptcy petition was dismissed due to Debtor's non-compliance of certain orders during the case. See, Docket No. 413 and 467 of Case No. 09-00699 (ESL).

2

'Single Asset Real Estate Case' as that term is defined in the Bankruptcy Code.[2]

4. As of the Petition Date, DF (who purchased the Loans from Doral Bank prior to the Petition Date) is the holder of a valid, perfected, secured claim in the amount of $5,219,362.45. See DF's Proof of Claim No. 16-2; Fed. R. Bankr. P. 3001(f).

5. Debtor filed a *Disclosure Statement* (the "*Disclosure Statement*") and Chapter 11 *Plan of Reorganization* (the "Plan") on April 30, 2012. See Dockets Nos. 53 and 54, respectively.

6. DF filed an objection to the Disclosure Statement on October 9, 2012, as supplemented, asserting, among other things, that the *Disclosure Statement*, as filed, is inadequate, and its proposed Plan is unconfirmable, because it fails to account for the costs associated with DEV, S.E.'s state court judgment denying access to the Project through the existing entrance and requiring said access to be relocated elsewhere (the "Access Road Issue"). See Dockets Nos. 127 and 132.

7. The hearing on approval of the *Disclosure Statement* was held on October 16, 2012. The court did not approve the *Disclosure Statement* and instructed the Debtor to file an amended Disclosure Statement by December 15, 2012. The court stated the following at the hearing:

> **The construction of an access road, as ordered by the state court, is critical to the success of the plan and the sale of units.** The history of the access road controversy and efforts to construct the same appear disclosed in pages 18-19. **However, a timetable for completion is necessary, particularly for creditors who receive property in payment to determine how to vote on the plan.** This matter will also be a confirmation issue as it affects the feasibility of the proposed Chapter 11 plan. Therefore, the debtor shall amend the disclosure statement within 60 days to inform the estimated timetable to build the access road, as well as the costs it entails. Replies due 21 days there[a]fter.

See Docket Nos. 140 and 141 (emphasis added).

8. The Debtor filed an *Amended Motion for Leave to Settle or Compromise* (the "*Motion for Leave*") on November 27, 2012, where it informed that it had reached a settlement agreement with DEV, SE as to the outstanding issues regarding the use of the existing access road to the Costa Bonita project (the "*DEV Settlement Agreement*"). See Docket No. 156, ¶¶ 3 and 4. The Debtor submitted

---

[2] The Court has already determined, on August 27, 2012, that the Debtor is a Single Asset Real Estate ("SARE"), as such term is defined in the Bankruptcy Code. See Opinion and Order, Docket No. 103, p. 31 ("the fact that the Debtor is a SARE case..."), p. 16 ("the fact that DF Servicing may have a mortgage on the property, which is a SARE..."); See also, Opinion and Order entered in Debtor's first bankruptcy case, finding that Debtor satisfied all prongs for the SARE case and is thus subject to section 362(d)(3), Docket No. 55, Case No. 09-0699).

3

a sealed copy of the *Settlement Agreement* to the Clerk of the Court. See Docket No. 156.[3]

9. On December 20, 2012, the Debtor requested a thirty (30) day extension to file its amended Disclosure Statement and Plan (Docket No. 173), which was granted by the court on December 26, 2012 (Docket No. 176).

10. The Debtor requested an additional ninety (90) day extension of time to file its amended Disclosure Statement and Plan on January 25, 2013 (Docket No. 202), which extension was granted by the court (Docket Nos. 204 and 217).

11. The Debtor requested an additional thirty (30) day period to file its amended Disclosure Statement and Plan on June 4, 2013, as well as an additional sixty (60) day period on August 8, 2013, which extensions were granted until October 25, 2013. See Docket Nos. 259, 286, and 293.

12. On October 25, 2013, the Debtor (once again) moved for a sixty (60) day extension to file its Disclosure Statement and Plan, and again on December 20, 2013, and once again on March 13, 2014, all which were granted by the court. See Docket Nos. 317, 318, 329, 332, 356 and 359.

13. The Debtor filed its *Amended Disclosure Statement* and Plan on May 20, 2014 (Docket Nos. 423 and 424), that is, after the hearing on the *Motion to Convert*, and after moving for the voluntary dismissal of the case on May 9, 2014 (Docket No. 407).

14. DF filed its *Motion to Convert* pursuant to 11 U.S.C. § 1112(b)(4)(A), (B), (C), (E), (F), and (I) on April 14, 2014. See Docket No. 374. On the same date, the Asociación de Condómines de Costa Bonita (the "HOA") filed a separate *Motion to Convert* under 11 U.S.C. § 1112(b)(4)(C), among other causes. See Docket No. 373.

15. HOA attached in its *Motion to Convert* a cancellation notice issued by Integrand Assurance Company indicating that the insurance policy for the Project is set to expire on April 25, 2014, unless the amount of $31,213.03 is paid on or before such expiration date. See Docket No. 373, p. 19.

16. On April 16, 2014, the court scheduled a hearing for April 29, 2014 at 2:00 p.m. to consider DF and the HOA's respective *Motions to Convert* to Chapter 7 (the "Conversion Hearing"). See Docket No. 382.

17. As of April 27, 2014, the Debtor had only filed Monthly Operating Reports ("MOR") corresponding to the periods up to November 30, 2013. See Dockets No. 34, 41, 80, 96, 101, 102,

---

[3] DF opposed Debtor's request to file the Settlement Agreement under seal on December 19, 2012. See Docket No. 171. Notwithstanding this, the Settlement Agreement remains under seal to date.

4

138, 139, 168, 207, 228, 229, 243, 247, 260, 276. 288, 292, 314, and 324-326.

18. On April 28, 2014, one day before the commencement of the Conversion Hearing, the Debtor filed the MORs for the remaining periods of December 2013 and January through March 2014. See, Docket Nos. 396-399. The Debtor did not request leave nor did it proffer through its filings an excuse or reason for the delay in submitting these MORs.

19. The Debtor filed its *Opposition* to DF and HOA's respective *Motions to Convert* to Chapter 7 on April 28, 2014. See Docket No. 400. As part of its *Opposition*, Debtor submitted and attached a Certificate of Liability Insurance issued by Lighthouse Insurance Group, Inc. dated April 25, 2014. See Docket No. 400-1 along with DF's Exhibit 5.

20. After the evidentiary hearing, that is, May 9, 2014, the Debtor moved for the voluntary dismissal of the petition (Docket No. 407).

### The Conversion Hearing and Amendment to the *Motion to Convert*

The Court commenced the Conversion Hearing on April 29, 2014 and concluded it on April 30, 2014. DF presented the testimony of Mr. Luis E. Vallejo of Vallejo & Vallejo Real Estate Appraisers and Counselors (admitted by the court as an expert in the area of real estate appraisals and valuations; see DF's Exhibit 1) and Mr. Ismael Ruiz Meléndez (admitted by the court as an expert in insurance and risk management; see DF's Exhibit 4). The Debtor presented Ms. Aida Escribano (as the Debtor's accountant and manager of its business operations), Eng. Carlos Escribano (the Debtor's President), and Mr. Fernando de Zengotita Rexach (the Debtor's expert witness in insurance; see Debtor's Exhibit A). A summary of the facts admitted into evidence through each such witness and the documents admitted is included below.

### Substantial Diminution of Estate: Valuation as of the Petition Date

DF attached to its *Motion to Convert* an appraisal report for the Real Estate Collateral prepared by Vallejo & Vallejo Real Estate Appraisers and Counselors (the "Vallejo Appraisal"). The Vallejo Appraisal was admitted into evidence as DF's Exhibit 2. Mr. Vallejo testified that he compared the Vallejo Appraisal Report to certain prior appraisals attached as part of the Debtor's *Disclosure Statement* (Docket Nos. 53-1 and 53-8), which appraisals were apparently prepared with

5

the same methodology (value to a single purchaser) used by Mr. Vallejo, and whose values were determined by the Debtor's appraiser to be in the amount of more than $12,243,170.00 prior to the Petition Date (Docket No. 53, p. 39). The Debtor's appraisals were admitted into evidence through Mr. Vallejo's testimony as DF's composite Exhibit 3 (the "Debtor's Appraisals").

DF also presented the testimony of the Debtor, through Mrs. Aida Escribano, CPA and Vice President of the Debtor, who admitted and recognized that the Debtor valued the Real Estate Collateral as of the Petition Date in the amount of $12,243,170.00 in Debtor's Schedules of Assets and Liabilities (the "Schedules") (Docket No. 17). The Schedules, through Mrs. Escribano, were admitted into evidence under DF's composite Exhibit 6. Mrs. Escribano also testified that the Debtor had not amended the value listed in such Schedules during the bankruptcy case.

Recent Valuation and Substantial Diminution

Mr. Vallejo also testified that he visited and inspected the Real Estate Collateral as part of his preparation of the Vallejo Appraisal, that he used the data and information reasonably utilized by appraisers in his field for the evaluation of the Real Estate Collateral, that the analysis and methodology used by him is the proper and typical by appraisers for the valuation of the same type of Real Estate Collateral, and that he concluded that the market value of the Real Estate Collateral to a single purchaser as of July 22, 2013 was $5,200,000.00. The Vallejo Appraisal was admitted into evidence as DF's Exhibit 2. The court notes that the Debtor stated at the Conversion Hearing that it would not contest or object to the valuation performed by Mr. Vallejo nor to the contents of the Vallejo Appraisal.

Upon performing the comparison of the Vallejo Appraisal with the values in the Debtor's Appraisals, as well as those admitted by the Debtor in its Schedules regarding the value of the Real Estate Collateral as of the Petition Date, Mr. Vallejo concluded that such values reflect a substantial decrease in the Real Estate Collateral's value from the Petition Date through the date of the Vallejo Appraisal of, at least, $7,043,170.00.

Mr. Vallejo further testified that the Access Road Issue had not been resolved at the time of his inspection of the Real Estate Collateral, and that, upon information reasonably relied and obtained

6

by him through his colleague, Mr. Antonio Puras, who visited the Real Estate Collateral during April 18-20, 2014, the Access Road Issue had not yet been resolved and is still pending. Moreover, Mr. Vallejo indicated that, based on the assessment of his colleague, Mr. Puras, during the visit on April 18-20, 2014, the condition of the Real Estate Collateral had deteriorated since July 22, 2013 to date. Mr. Vallejo testified that the continued existence and failure to remedy the Access Road Issue and the deterioration of the Real Estate Collateral's condition have an adverse effect on the value of the Real Estate Collateral.

Other Valuation Issues

At the conclusion of the April 29, 2014 Conversion Hearing, the Debtor announced for the first time that it intended to call as a witness Mr. Carlos Gaztambide, as an expert appraiser, and present an alleged appraisal report to be part of the evidence during the continuation of the Conversion Hearing on April 30, 2014. The Debtor had not previously announced such witness, nor had it filed or submitted to DF a copy of such appraisal report. The court ordered the Debtor to produce to DF, on April 29, 2014, a copy of Mr. Gaztambide's alleged appraisal report (the "Appraisal Production Order"). On April 29, 2014, DF filed an informative motion indicating that the Debtor had not complied with the Appraisal Production Order, as the Debtor had not provided to DF a copy of Mr. Gaztambide's alleged appraisal. See Docket No. 401.

On April 30, 2014, at the commencement of the continuation of the Conversion Hearing, DF informed the court that the Debtor had failed to comply with the Appraisal Production Order. The Debtor admitted its failure to produce to DF a copy of Mr. Gaztambide's alleged appraisal, and stated that it would produce a copy of such appraisal to DF. The appraisal report by Mr. Gaztambide was not produced. Therefore, DF requested that the *Motion to Convert* be supplemented orally, to include an additional cause to convert under Section 1112(B)(E) due to the Debtor's admitted and unexcused failure to comply with the Appraisal Production Order. The court allowed DF's oral amendment to the *Motion to Convert*.

Lack of Appropriate Insurance

HOA included a notice of cancellation of the Debtor's existing insurance as an exhibit to its

7

*Motion to Convert.* See Docket No. 373, p. 19. In its *Opposition* to the HOA's and DF's *Motions to Convert*, the only document proffered and attached by the Debtor in response to all of the allegations included therein was a certificate of insurance. See DF's Exhibit 5.

DF presented the testimony of Mr. Ismael Ruiz Meléndez. He was admitted as an expert witness in insurance and declared that the insurance policy over the Project had expired on April 25, 2014 due to the Debtor's failure to pay the outstanding dues of $31,213.03, and, therefore, it needed to renew such insurance. Mr. Ruiz also testified that the Debtor (as owner of property located within the Project) had an ownership participation on the Project's common areas pursuant to the Puerto Rico Horizontal Property Law. He stated that the Project is currently without insurance, and clarified that the only entity authorized to procure insurance for the Project under the Puerto Rico Horizontal Property Law is the HOA itself.

Mr. Ruiz also testified that, as far as the Debtor's Certificate of Liability Insurance dated April 25, 2014 is concerned (DF's Exhibit 5), which was the certificate of insurance that the Debtor represented in its *Opposition* as evidencing the fact that the Debtor allegedly had insurance, is inadequate for the following reasons: (a) the insurance policy does not cover the Debtor, but the HOA; (b) in order for the HOA to be a named-insured in this policy, it requires express authorization by the HOA (which the HOA had not provided); (c) the insurance policy does not provide liability coverage to the Real Estate Collateral; (d) the insurance policy does not provide property coverage to the commercial space of the Real Estate Collateral; (e) it is unclear whether the insurance policy covers all residential units owned by Debtor in the Project; and (f) the insurance policy does not provide any coverage to the Real Estate Collateral's common areas (of which Debtor's hold an ownership participation interest). See DF's Exhibit 5. Mr. Ruiz concluded that, upon his assessment of the Debtor's Certificate of Liability Insurance dated April 25, 2014, the Project does not currently have insurance, the insurance policy obtained by the Debtor is inadequate, that the Debtor is not authorized to procure insurance for the Project, and that the coverage afforded by Debtor's insurance policy is insufficient to cover all of Debtor's interest in the Real Estate Collateral.

The Debtor had asserted that the insurance that it had in place was through the certificate of

insurance that it attached to the *Opposition*, and which was the subject of the testimony of Mr. Ruiz detailed above and admitted into evidence as DF's Exhibit 5. After the Conversion Hearing on April 29, 2014, and hearing the testimony of Mr. Ruiz on April 30, 2014 (and the Debtor having cross examined Mr. Ruiz on DF's Exhibit 5), the Debtor announced for the first time that it had allegedly obtained a new insurance on April 29, 2014 to correct typographical errors in the one it filed as part of its *Opposition* to the *Motion to Convert* and that it obtained an additional and new insurance on April 30, 2014 (the "Alleged New Certificates of Insurance").

DF presented an oral motion *in limine* and opposed the presentation into evidence of any such Alleged New Certificates of Insurance or testimony related to the same. In support thereto, DF cited case law and the doctrines of judicial estoppel, equitable estoppel, and quasi estoppel as basis for exclusion. DF's argument was based on the fact that the Debtor allegedly had such new insurance since April 29, 2014 (as to one of the certificates) and yet failed to present it to DF or to the court on that day, allowed DF to present its witness on insurance, the Debtor cross examined such witness, on the certificate that the Debtor had filed with its *Opposition* to the *Motion to Convert*, without disclosing at any such time that it had already in its possession different insurance policies. Further, the Debtor had represented to the court and DF that its insurance was the one admitted as DF's Exhibit 5, and now was changing its position through the Alleged New Certificates of Insurance. After considering such arguments and the Debtor's response, the court ruled that DF had met its burden for exclusion of the Alleged New Certificates of Insurance under the estoppel doctrines and case law cited by DF. The Court also found that the Debtor's failure to timely disclose the Alleged New Certificates of Insurance was sanctionable conduct. Notwithstanding, the court allowed the Debtor to present its position at the Conversion Hearing on the Alleged New Certificates of Insurance, subject to the imposition of sanctions of $1,950 against the Debtor corresponding to the expenses incurred by DF in the procurement, preparation and appearance of its expert witness, Ismael Ruiz Meléndez. The court ordered that such sanctions be paid to DF within 48 hours.

The Debtor then presented Mr. Fernando de Zengotita Rexach, as an expert on insurance, who testified as to the Debtor's procurement of the Alleged New Certificates of Insurance on April 29,

9

2014 and on April 30, 2014, that is, hours before the continuation of the Conversion Hearing. According to Mr. de Zengotita's testimony, the Alleged New Certificates of Insurance did not name DF as a loss payee (they name Doral Bank).

DF objected to the court admitting into evidence the Alleged New Certificates of Insurance, due to the reasons stated in its motion in limine, as well as the fact that the certificates were incomplete as they did not include the actual policy. While the Debtor alleged that the policy had been previously filed in the case, such allegation was unfounded. The court granted DF's request to exclude the Alleged New Certificates of Insurance and did not admit them into evidence.

Mr. Ismael Ruiz Meléndez was called by DF as a rebuttal witness. Mr. Ruiz testified that Debtor's Alleged New Certificates of Insurance were deficient and inadequate as well based on the following reasons: (a) the insurance policy does not name the HOA as an additional insured, nor do they name DF as a loss payee; (b) the insurance policy does not provide either liability or property coverage to the commercial space of the Real Estate Collateral; (c) the alleged insurance policy does not provide liability coverage on the outside areas of the Real Estate Collateral; (d) it is unclear whether the insurance policy covers all residential units owned by Debtor in the Project; and (e) the insurance policy does not provide any coverage to the Real Estate Collateral's common areas (of which Debtor's hold an ownership participation interest). Mr. Ruiz concluded that the Alleged New Certificates of Insurance were insufficient and inadequate to cover all of the Debtor's interest in the Real Estate Collateral, they do not comply with the requirements of the Puerto Rico Horizontal Property Law, they are inadequate as a matter of coverage, and (once again) that the Debtor is not the authorized representative to procure insurance for the Project.

Other Causes to Convert

The Debtor, through Ms. Aida Escribano (Vice President of the Debtor and CPA) testified to the contents and information contained at the Debtor's MORs (DF's composite Exhibit 7) as well as the Debtor's Schedules (DF's composite Exhibit 6). The Debtor's MORs were all admitted into evidence, and the filed-stamped copy at the top shows the date of filing for each one. DF's composite Exhibit 7. The Debtor testified that the information in the MORs was correct to the best of its

knowledge (subject to a potential reconciliation on certain accounts receivables).

The Debtor, through Ms. Escribano, indicated that from the Petition Date through March 31, 2014, the Debtor had received cumulative income of $551,364.95 and had disbursed cumulative expenses of $558,917.83. Of such cumulative income, only $276,549.30 was operational income that was actually generated by the Debtor, while the remainder consists mostly of advances or loans from the Debtor's stockholders and owners (which total $256,106.42). See DF's composite Exhibit 7 (MOR for March 2014). Ms. Escribano admitted that the Debtor had not made any post-petition payments to DF, nor post-petition payments for any type of taxes. She also admitted that the Debtor had not paid all fees and expenses allowed by the court for its prior Chapter 11 counsel, Charles A. Cuprill. The Debtor also admitted that it did not know the amount due to CRIM for post-petition taxes, nor could it estimate the total amount of administrative expenses accrued in the bankruptcy case. Any amount due to CRIM would be paid as part of a plan.

Ms. Escribano testified that the Debtor's only course for rehabilitation consists on the potential sale or agreement for the operation of the Real Estate Collateral to a third party. However, Mrs. Escribano was not able to provide the identity of any such prospective third-party purchaser and admitted that no agreement, term sheet, or other signed document exists for any such potential transaction, and that the potential third party contacted the Debtor for the first time two weeks prior to the Conversion Hearing.

Eng. Carlos Escribano testified to the effect that the Access Road Issue has not yet been resolved and that action is still pending towards the construction, implementation, or remediation, of the access road since the execution of the DEV Settlement Agreement (in November 14, 2012) to date.

The Debtor also stated at the hearing that while it had not yet objected to DF's amended proof of claim (POC 16-2), that it reserved the right to do so. DF countered that the Debtor was taking another inconsistent position, as it had previously represented and argued in the Surcharge Motion its request to surcharge the Real Estate Collateral against DF pursuant to Section 506(c) of the Bankruptcy Code, and one of the elements in the section for a surcharge against DF is that it hold an

11

allowed secured claim. The court noted that DF's claim was entitled to *prima facie* validity pursuant to Fed. Bankr. R. Evid. 3001(f) and that it would decide an objection to the claim, and DF's response thereto, once and if properly presented.

Applicable Law

*(A)     Cause for Conversion or Dismissal pursuant to 11 U.S.C. § 1112(b)*

Section 1112(b)(1) of the Bankruptcy Code provides as follows:

> Except as provided in paragraph (2) and subsection (c), on request of a party in interest, and after notice and a hearing, the court **shall** convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter, whichever is in the best interests of creditors and the estate, for cause unless the court determines that the appointment under section 1104(a) of a trustee or an examiner is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1) (emphasis added).

The Court's discretion to dismiss or convert a Chapter 11 case is limited if cause is established. See Gilroy v. Ameriquest Mortg. Co. (In re Gilroy), 2008 Bankr. Lexis 3968, 2008 WL 4531982 (B.A.P. 1st Cir. 2008); AmeriCERT, Inc. v. Straight Through Processing, Inc. (In re AmeriCERT, Inc.), 360 B.R. 398, 401 (Bankr. D. N.H. 2007) ("Prior to its amendment, the statute provided that a court 'may' dismiss the case upon finding cause, but amended section 1112(b) provides that a court 'shall' dismiss if cause is found, absent unusual circumstances."). The initial burden is on the movant to argue and present evidence by a preponderance of the evidence standard to prove its position that there is cause for either conversion or dismissal of the Chapter 11 case, whichever is in the best interests of creditors and the estate. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.04[4] (16th ed. 2011). "Thus, until the movant carries this burden, the statutory direction that the court 'shall convert the case to a case under chapter 7 or dismiss the case' is not operative." Id. Once cause is found, the burden shifts to the opposing party to show why dismissal or conversion would not be in the best interests of the estate and the creditors. See In re Dr. R. Samanta Roy Institute of Science Technology Inc., 465 Fed. Appx. 93, 96-97 (3rd Cir. 2011). Once the movant establishes "cause", the burden shifts to the debtor to demonstrate by evidence the "unusual circumstances" that establish that dismissal or conversion to Chapter 7 is not in the best interests of the creditors and the estate. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.05[1] (16th ed. 2011). The bankruptcy court retains

12

discretion in determining whether unusual circumstances exist and whether conversion or dismissal is in the best interest of creditors and the estate. See id.;In re Gilroy, 2008 Bankr. Lexis 3968. A determination of unusual circumstances is fact intensive and contemplates facts that are not common to Chapter 11 cases. See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶1112.05[1] (16th ed. 2011). If the Chapter 11 case is devoid of "unusual circumstances", then the bankruptcy court must apply the Section 1112(b)(2)[4] analysis to determine whether the Chapter 11 case is dismissed or converted. The objecting party must establish all of the factual elements stated in subparagraphs (A) and (B) of Section 1112(b)(2). See Alan N. Resnick & Henry J. Sommer, 7 Collier on Bankruptcy ¶ 1112.05[1] (16th ed. 2011). Thus, the bankruptcy court may not convert or dismiss a case if: "(1) there is a reasonable likelihood that a plan will be confirmed within a reasonable time; (2) the 'cause' for dismissal or conversion is something other than a continuing loss or diminution of the estate coupled with a lack of reasonable likelihood of rehabilitation; and (3) there is a reasonable justification or excuse for a debtor's act or omission and the act or omission will be cured within a reasonable time." In re Orbit Petroleum, Inc., 395 B.R. 145, 148 (Bankr. D.N.M. 2008), aff'd 421 B.R. 602 (B.A.P. 10th Cir. 2009).

Although Section 1112(b)(4) of the Bankruptcy Code fails to define what the term "cause" means, it provides a list of circumstances that constitute "cause" for conversion or dismissal. This list of causes is non-exhaustive and therefore a case may be converted or dismissed for other causes. See In re AmeriCERT, Inc., 360 B.R. at 401; Tuli v. US Trustee, 124 Fed. Appx. 830, 831 (5th Cir.

---

[4] Section 1112(b)(2) provides that:

[t]he court may not convert a case under this chapter to a case under chapter 7 or dismiss a case under this chapter if the court finds and specifically identifies unusual circumstances establishing that converting or dismissing the case is not in the best interests of creditors and the estate, and the debtor or any other party in interest establishes that–

(A)    there is a reasonable likelihood that a plan will be confirmed within the time frames established in sections 1121(e) and 1129(e) of this title, or if such sections do not apply, within a reasonable period of time; and

(B)    the grounds for converting or dismissing the case include an act or omission of the debtor other than under paragraph (4)(A)--

(i)    for which there exists a reasonable justification for the act or omission; and

(ii)    that will be cured within a reasonable period of time fixed by the court.

13

2005).  Also see 11 U.S.C. § 1112(b)(4) (using the term "includes" before listing various reasons for dismissing a case).  Section 1112(b)(4)(I) specifically establishes that "failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief" constitutes cause to dismiss or convert a Chapter 11 case.  Thus, failure to file a tax return or pay taxes post-petition is ground for dismissal.  See In re Dr. R. C. Samanta Roy Inst. of Sci. Tech. Inc.,465 Fed. Appx. at 98.

Section 1112(b)(1) requires "notice and a hearing" prior to dismissal or conversion.  The phrase "notice and a hearing" is defined as "after such notice is appropriate *in the particular circumstances*, and such opportunity for a hearing is appropriate *in the particular circumstances*".  11 U.S.C. § 102(A) (emphasis added).  Also see Yehyd-Monosson USA, Inc. v. Fokkena (In re Yehyd-Monosson USA, Inc.), 2011 Bankr. LEXIS 3725 (8th Cir. 2011) (no evidentiary hearing was required under 11 U.S.C. § 1112 when the court's decision is supported in a Debtor's admission of a fact), In re De Jounghe, 334 B.R. 760, 766 (1st Cir. B.A.P. 2005) ("a full evidentiary [hearing] is not required, so long as the parties had a fair opportunity to offer relevant facts and arguments to the court and to confront their adversaries' submissions"); In re C-TC 9th Ave. Partnership, 113 F. 3d 1304, 1312 (2nd Cir. 1997) (an evidentiary hearing was not necessary when "the record is sufficiently well developed to allow the bankruptcy court to draw the necessary inferences to dismiss a Chapter 11 case for cause").  Even when a non-evidentiary hearing is conducted under 11 U.S.C. § 1112(b), "failure to offer evidence at the hearing may constitute a waiver by the debtors." In re De Jounghe, 334 B.R. at 766 ,citing In re City Stores Co., 42 B.R. 685, 689 (S.D.N.Y. 1984).

After the moving party establishes that there is cause to dismiss or convert the case to Chapter 7, the court must choose between dismissal or conversion, "whichever is in the best interest of creditors and the estate." 11 U.S.C. § 1112(b)(1).  The standard for choosing between conversion or dismissal based on "the best interest of creditors and the estate" implies application of a balancing test by the bankruptcy court.  See In re De Jounghe, 334 B.R. at 770; In re Staff Inv. Co., 146 B.R. 256, 260 (Bankr. E.D. Cal. 1992).  The legislative history shows that Congress intended to invest the bankruptcy court with "wide discretion ... to make an appropriate disposition of the case" and "to consider other factors as they arise, and use its equitable powers to reach an appropriate result

in individual cases." In re De Jounghe, 334 B.R. at 770, citing H.R. Rep. No. 595, 95[th] Cong., 2d Sess. 406, reprinted in 1978 U.S.C.C.A.N. 5963, 6361-62.

Discussion

Diminution of the Estate and Absence of a Reasonable Likelihood of Rehabilitation

Section 1112(b)(4) of the Bankruptcy Code provides as cause for the dismissal or conversion of a Chapter 11 petition "substantial or continuing loss or diminution of the estate and the absence of a reasonable likelihood of rehabilitation". 11 U.S.C. § 1112(b)(4).

The value of the Real Estate Collateral has diminished substantially since the Petition Date from the initial $12,243,170.00 value admitted and acknowledged by the Debtor in its Schedules (DF's composite Exhibit 6), its own appraisals (DF's composite Exhibit 3) and admitted by the the Debtor through its designee Mrs. Escribano, to the $5.2 million market value to a single purchaser according to the July 22, 2013 Vallejo Appraisal. DF's Exhibit 2. The Debtor stated at the hearing that it would not contest the valuation performed by Mr. Vallejo. Thus, it is uncontested that there is a diminution of $7,043,170.00. The value of the Real Estate Collateral may continue to diminish unless the premises are properly maintained. In addition, the Debtor's admission that the Access Road Issue has not been resolved to date will adversely affect the marketability and value of the remaining units. Furthermore, the value of the Real Estate Collateral has continued to decline as the Debtor has allowed the continued accrual of property tax liens on the Real Estate Collateral since 2012 to date. The Debtor admitted that it has not made a single payment of post-petition real property taxes.

As far as the "reasonable likelihood of rehabilitation" standard is concerned: "[r]ehabilitiation means to reestablish a business. Whereas confirmation of a plan could include a liquidation plan, rehabilitation does not include liquidation." Collier on Bankruptcy ¶ 1112.04[6][a]. Also see Santa Fe Minerals, Inc. v. BEPCO, L.P., 386 B.R. 548, 552 (Bankr. D. Del. 2008) (rehabilitation means restoration of a business' viability; liquidation is not rehabilitation); In re Schriock Constr. Inc., 167 B.R. 569, 576 (Bankr. D.N.D. 1994) ("A plan for rehabilitation under Chapter 11 must be based on more than speculative data").

The preponderance of the evidence based on the totality of the circumstances shows that the

15

Debtor will not be able to rehabilitate or reorganize.

The Project, as a whole, has a market value of $5,200,000.00 as of July 22, 2013 and may continue to decline. DF's claim totals $5,219,362.45. Hence, any potential proceed and/or distribution generated from the Real Estate Collateral would go in full to DF, without any benefit to any other constituency. Since the Debtor has no equity in the Real Estate Collateral and any potential exit financing that the Debtor is considering, or may consider, would only yield a payment that would be less than the amount of DF's claim (and all proceeds would be paid to DF). At this stage, the estate appears administratively insolvent.

During the course of the instant bankruptcy proceeding, the Debtor has earned a cumulative income of $551,364.95 and has paid the cumulative expenses of $558,917.83, which yield a cumulative net loss of $7,552.88. Of the Debtor's cumulative income, only $276,549.30 was generated by the Debtor. The remainder of the Debtor's income consists, mostly, of advances from stockholders, which total $256,106.42. The Debtor does not currently generate sufficient income by itself to cover the few operating expenses that it has actually paid during the case (which payments did not include either post-petition payments to DF, post-petition payment for taxes, payment of all allowed professional fees, or payments to the HOA for its portion of the insurance). Therefore, it is unlikely that the Debtor will be able to pay any proposed plan of reorganization. See DF's composite Exhibit 7.

The Debtor's proposed course of rehabilitation appears to consist of the sale or other agreement to operate the Real Estate Collateral to an as-of-yet to be identified third party purchaser. Such proposed course of action is speculative and will not qualify as a "rehabilitation" as required by Section 1112(b)(4)(A) as the Debtor would be, essentially, ceasing all of its operations.

Although the Debtor entered into the DEV Settlement Agreement in November 2012, it admitted, through Eng. Carlos Escribano, that as of today, it has not commenced the construction, repair, or work on the Access Road Issue. As indicated by the court back on October 16, 2012, the resolution of the Access Road Issue is a key element in this case. See Docket Nos. 140 and 141. The fact that the access road, as supposedly agreed between Debtor and DEV, is not yet in place after almost two (2) years shows little progress towards a rehabilitation or reorganization has been

made by the Debtor. The lack of a legally-valid access road effectively leaves the residents, visitors, and potential purchasers of units at the Real Estate Collateral without an appropriate entrance to the Project. Furthermore, the continuing existence of this issue actively affects the marketability and selling value of the Real Estate Collateral due to the risks involved in purchasing a property without adequate access.

Any proposed reorganization plan by the Debtor may also be unconfirmable under Sections 1129(a)(11) and 1129(b)(2) of the Bankruptcy Code in the event that DF were to make a Section 1111(b) election to treat its debt as fully secured, as the Debtor does not have the financial capacity to make the required payments under this particular scenario. It is highly unlikely that the Debtor can confirm a plan considering that DF would control the secured class of any prospective plan, as well as the unsecured class in light of the potential amount of DF's deficiency claim.

Therefore, the court concludes that the Debtor will not be able to effectively rehabilitate in this case, and finds that considering the continued substantial loss or diminution to the estate, there exists sufficient cause for dismissal or conversion pursuant to 11 U.S.C. § 1112(b)(4)(A). No "unusual circumstances" have been demonstrated.

Risk to the Estate or the Public

Section 1112(b)(4)(C) identifies as a separate cause for conversion or dismissal a debtor's failure to "maintain appropriate insurance that pose a risk to the estate or the public". 11 U.S.C. § 1112(b)(4)(C). According to the evidence on the record, the insurance policy over the Project expired on April 25, 2013 due to Debtor's failure to make the corresponding payment of $31,213.03. Thus, the Real Estate Collateral's common areas, among others, are currently exposed, areas for which the Debtor holds a percentage of ownership interest pursuant to the Puerto Rico Horizontal Property Law.

The credible testimony of Mr. Ruiz shows that the Debtor's April 25, 2014 Certificate of Liability Insurance is inadequate for the following reasons: (a) the insurance policy does not cover Debtor, but the HOA; (b) in order for the HOA to be a named-insured in this policy, it requires express authorization by the HOA (which the HOA had not provided); (c) the insurance policy does not provide liability coverage to the Real Estate Collateral; (d) the insurance policy does not provide

17

property coverage to the commercial space of the Real Estate Collateral; (e) it is unclear whether the insurance policy covers all residential units owned by Debtor in the Project; and (f) the insurance policy does not provide any coverage whatsoever to the Real Estate Collateral's common areas (of which Debtor's hold an ownership participation interest). See DF's Exhibit 5.

The testimony of Mr. Ruiz established that the Debtor's Alleged New Certificates of Insurance, which were not admitted into evidence, are also not adequate for purposes of the instant bankruptcy case inasmuch as: (a) they do not name the HOA as an additional insured, nor do they name DF as a loss payee; (b) they do not provide either liability or property coverage to the commercial space of the Real Estate Collateral; (c) they do not provide liability coverage on the outside areas of the Collateral; (d) it is unclear whether any of these policies cover the residential units owned by Debtor in the Project; (e) the insurance policy does not provide any coverage to the Real Estate Collateral's common areas; and (f) Debtor is not the authorized representative to procure coverage for the Project in accordance to the Puerto Rico Horizontal Property Law.

Based on the above, the court finds that there exists sufficient cause for the dismissal or the conversion of the case to a Chapter 7 proceeding pursuant to 11 U.S.C. § 1112(b)(4)(C). No "unusual circumstances" have been demonstrated.

### Failure to Timely file Monthly Operating Reports

Section 1112(b)(4)(F) of the Bankruptcy Code provides cause for conversion or dismissal for "unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter." 11 U.S.C §1112(b)(4)(F). Failure to file the periodic reports required by Fed. R. Bankr. P. 2015 may constitute cause for conversion or dismissal of a Chapter 11 case. In re Modern Office Supply, 28 B.R. 943, 945 (Bankr. W.D. Okla. 1983). As stated by Collier's, the fact that the Debtor attempted to cure the failure to file the MORs is insufficient, as "unexcused failures to report or file required information … will constitute cause" to convert. Collier on Bankruptcy ¶ 1112.04[6][g].

"Refusal or inability to provide financial disclosure sounds the death knell of a Chapter 11 case. The failure to file monthly operating statements ... 'whether based on inability to do so or otherwise, undermines the Chapter 11 process and constitutes cause for dismissal or conversion of

18

the Chapter 11 proceedings.'" In re Tornheim, 181 B.R. 161, 164 (Bankr.S.D.N.Y. 1995) (citations omitted). In In re Crosby, 93 B.R. 798 (Bankr. S.D. Ga. 1988), the court recognized, but did not hold, that there is authority for dismissing a case for cause where a debtor did not file monthly operating reports until the morning of a hearing on the failure to file the reports. Likewise, in In re Whitehurst, 198 B.R. 981 (Bankr. N.D. Ala. 1996), the court found that failing to file Chapter 11 operating reports is sufficient Section 1112(b) cause for dismissing or converting a Chapter 11 case. In Babakitis v. Robino (In re Robino), 243 B.R. 472, 486 (Bankr. N.D. Al. 1999), the court dismissed the case *inter alia* due to debtor's failure to file his monthly operating reports and reasoned as follows: "the debtor left [the] Court and the parties without the information the reports were designed to produce. The harm is both legal and practical. Neither can be ignored."

Debtor's last MOR on file as of April 27, 2014 corresponded to the MOR for the period ending in November 30, 2013, which was filed back in December 19, 2013. See Docket No. 326. It was not until April 28, 2014, that is, prior to the commencement of the Hearing, that the Debtor cumulatively filed its outstanding December 2013 to March 2014 MORs. See Docket Nos. 396-399. The Debtor has failed to articulate any justifiable reason or excuse for the late filing of these MORs, which have deprived creditors and parties-in-interest from obtaining sufficient information as to the status of the Debtor's operations.

Therefore, cause exists for the dismissal or conversion of this case pursuant to section 1112(b)(4)(F). No "unusual circumstances" have been demonstrated.

Failure to Timely Pay Taxes

Section 1112(b)(4)(I) of the Bankruptcy Code provides that a case may be dismissed or converted to Chapter 7 for "failure [to] timely pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief". 11 U.S.C. § 1112(b)(4)(I). The Debtor has admitted that it has not made any payment whatsoever for taxes since the filing of this case to date, that is, for over a two (2) year period.

The Debtor's assertion to the effect that these taxes will be paid as an administrative expenses on the effective date of any potential plan does not provide basis for the court not to find cause under section 1112(b)(4)(I), as explained by this court in its decision of In re Torres, 2011

Bankr. LEXIS 4103 at *16 (Bankr. D.P.R. 2011). Therefore, dismissal or conversion is appropriate pursuant to 11 U.S.C. § 1112(b)(4)(I).

### Conversion, not Dismissal, is in the Best Interest of Creditors

Having found that there is cause for the dismissal or conversion of the case to Chapter 7, the court must now determine whether conversion, as requested by DF and the HOA, or dismissal, as requested by the Debtor and related parties, is appropriate. To determine whether a case should be dismissed or converted, the court must make a determination under Section 1112(b), which "invokes a two-step analysis, first, to determine whether 'cause' exists either to dismiss or to convert the chapter 11 proceeding to a chapter 7 proceeding, and second to determine which option is in the best interest of creditors and the estate." Rolex Corp. v. Associated Materials, Inc., 14 F.3d 240, 242 (4th Cir. 1994). Also see In re Mechanical Maintenance, Inc., 128 B.R. 382, 386 (E.D. Pa. 1991) ("Once the threshold is passed and cause is found to exist, the decision whether to convert to Chapter 7 or to dismiss is committed to the discretion of the bankruptcy court … The choice of conversion or dismissal must be based, nevertheless, on a 'best interest of creditors and the estate' test.").

Even though the Bankruptcy Code does not define the phrase "best interest of the creditors and the estate", courts have typically considered the following factors to determine whether dismissal or conversion is in the best interest:

> (1) whether some creditors received preferential payments, and whether equality of distribution would be better served by conversion rather than dismissal, (2) whether there would be a loss of rights granted in the case if it were dismissed rather than converted, (3) whether the debtor would simply file a further case upon dismissal, (4) the ability of the trustee in a chapter 7 case to reach assets for the benefit of creditors, (5) in assessing the interest of the estate, whether conversion or dismissal of the estate would maximize the estate's value as an economic enterprise, (6) whether any remaining issues would be better resolved outside the bankruptcy forum, (7) whether the estate consists of a "single asset," (8) whether the debtor had engaged in misconduct and whether creditors are in need of a chapter 7 case to protect their interests, (9) whether a plan has been confirmed and whether any property remains in the estate to be administered, and (10), whether the appointment of a trustee is desirable to supervise the estate and address possible environmental and safety concerns.

Collier on Bankruptcy, supra, at ¶ 1112.04[7]. In essence, "the court should evaluate and choose the alternative that would be most advantageous to the parties and the estate as a whole." Id. Also see In re Babayoff, 445 B.R. 64, 81-82 (Bankr. E.D.N.Y. 2011); In re BH S&B Holdings, LLC, 439

20

B.R. 342, 346 (Bankr. S.D.N.Y 2011) (both cases adopting these factors to determine whether to convert or dismiss a Chapter 11 case if cause exists under Section 1112).

<u>Post-Hearing Request for Voluntary Dismissal</u>

After the evidentiary hearing, the Debtor moved for the voluntary dismissal of the case. <u>See</u> Docket No. 407. The Debtor consents that the dismissal be with a bar to refile for a period of eighteen (18) months.

In this case, the estate's two most active creditors, DF and the HOA, favor the conversion. However, the Debtor and some related parties now favor dismissal. Under this scenario the factor of parties in interest favoring either conversion or dismissal is not decisive.

The Debtor admitted to a number of post-petition transfers and payments to insiders. The Debtor also admitted to repayments to insiders for unauthorized post-petition loans or capital contributions. These payments may be investigated and possibly recovered by a Chapter 7 trustee for the benefit of the estate. At this stage, this factor is speculative.

The Debtor is a single asset real estate. The Debtor's assets are all encumbered in favor of DF. The uncontested value of the assets is less than the secured debt. Thus, there is no equity for unsecured creditors.

The critical factor, in light of the facts before the court, and the Debtor's history, that a refiling may again frustrate the efforts by the secured creditor DF and the HOA to collect the amounts owed. In this vein, the Debtor has consented to a bar to refile of eighteen (18) months. Although the court finds that a bar to refiling for eighteen (18) months may tilt the scales towards dismissal, the period is not reasonable under the circumstances. The court finds that a bar to refiling for a period of thirty-six (36) months is the adequate deterrent period in favor of dismissal.

<u>Conclusion</u>

The evidence in this case established that there is cause to convert or dismiss the petition pursuant to 11 U.S.C. § 1112(b)(4)(A), (C), (F) and (I). The court concludes that dismissal with a bar to refiling for a period of thirty six (36) months is in the best interest of creditors as unsecured creditors are not likely to receive a dividend upon liquidation.

Accordingly, DF's *Motion to Convert*, as supplemented at the Conversion Hearing, is hereby

denied. However, the case is hereby dismissed and the Debtor is hereby enjoined from filing a bankruptcy petition, under any chapter, for a period of thirty six (36) months.

SO ORDERED.

In San Juan, Puerto Rico, this 2nd day of June, 2014.

Enrique S. Lamoutte
United States Bankruptcy Judge